IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DAVID RANDALL POLK,                    Case No. 5:12-cv-65-RS-CJK

     Plaintiff,

v.

HON. JOE NUGENT, et al.,

     Defendants.

## MOTION TO COMPEL BETTER ANSWERS AND TO CONDUCT FURTHER DISCOVERY AND TO TAKE MOTION OUT OF TIME

COMES NOW the Plaintiff, by and through the undersigned attorney, and moves this Honorable Court to compel witnesses Witten and Hill to provide better answers to Fed.R.Civ.P. 31 Deposition on Written Questions, or in the alternative, to permit oral deposition under Fed.R.Civ.P. 30, to permit further discovery based on the answers, and to permit this Motion to Compel out of time considering that the answers were not provided until after the discovery deadline, and would further show:

1. This is a case in which a young man spent nearly six years incarcerated for a crime he did not commit and could not have committed. Because police investigators withheld certain exculpatory evidence showing not only that the crime alleged was not committed by Plaintiff but that, more probably than not, the crime was not committed at all. This, the investigators were able to do with the aid of prosecutors "willful blindness" or even connivance. Eventually,

Plaintiff was able to win his day in court and was acquitted of the charges with the aid of the evidence withheld from him.

2.   The evidence withheld was a hospital rape report that found no evidence of trauma whatever on the body of an eleven-year-old child who claimed that she had been vaginally, anally, and orally penetrated by a mature male. There was no evidence of sperm although the child had not bathed, douched, or rinsed her mouth and although she specifically claimed that Plaintiff had ejaculated. And the carpet and bedding on which the child claimed she had been lying was negative for Plaintiff's DNA.

3.   Law enforcement documents suggest that the evidence was in the hands of law enforcement during the investigation and initial prosecution of the case but was not in the files of the assistant state attorney on April 21, 2006, when Plaintiff, having won the opportunity for a new trial through his own postconviction efforts, went to hearing to withdraw his earlier plea before Judge Judy Pittman.

4.   Plaintiff set the former prosecutors for deposition in this case to elicit from them the mechanics and circumstances under which the exculpatory evidence should have moved from the hands of the investigators who secured it to the prosecutors. Both of the former prosecutors sought a protective order prohibiting their depositions on the basis of prosecutorial immunity and deliberative privilege. The protective order was granted in part but the Court permitted the Plaintiff to pose ten written questions under Fed.R.Civ.P. 31.

5.   Plaintiff drafted questions intended to ascertain how the evidence would have been received and treated in the office of the prosecutor and how, whether by accident or misconduct, evidence that was clearly in the hands of officers and which was clearly material to the allegations of the complaint and was further exculpatory so that probable cause was vitiated, was not to be found in prosecutors' files when the matter was judicially reviewed in 2006.

6.   As of the time Plaintiff was due to respond to the Defendants' Motions for Summary Judgment, the answers to the Rule 31 questions had not been received. Now both sets of answers have been received although they are unsworn, evasive, unresponsive, and incomplete. The process Plaintiff sought to have explicated remains murky and indistinct. Plaintiff seeks better answers, preferably through actual oral depositions under Fed.R.Civ.P. 30, and the opportunity to conduct further depositions thereafter.

7.   The unsworn answers of the former prosecutors, attached as exhibits A and B hereto, were provided respectively on May 9, and May 21, 2013.

**Answers of Fred Witten**

| Deposition Question | Response |
|---|---|
| 1. Identify the persons in the Office of the State Attorney with responsibility for securing and maintaining evidence, including clerical personnel, during the time you were an Assistant State Attorney, giving the dates of their service in that capacity. | The investigating officers would secure the evidence and maintain it until it was introduced at trial. I would sometimes review it prior to the complaint being filed but in many cases, the complaint was filed with the clerk and copies were sent to the Office of the State Attorney and the Office of the Public Defender. |

Mr. Witten doesn't identify person in his office who routed to evidence to him and does not indicate who maintained the documents – whether they were kept in his physical control or kept in a central location by another staff person. It is not clear if anyone other than him had possession of or access to the files.

If an oral deposition had been permitted, I would have followed up with a question as to whether this case were one of those in which Mr. Witten reviewed the evidence prior to a complaint being filed and whether he saw the exculpatory medical examination report prior to a complaint being filed. I would also ask if the investigating evidence who held the evidence for trial would provide a synopsis of the evidence and what it would show. I would have asked if all evidence was supposed to be listed in the investigative reports. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 2. Describe the system of interaction with the Gulf County Sheriff and FDLE on the review, inspection, and transfer of evidence in criminal cases, including the identities of persons with whom you interacted and persons who interacted on your behalf. | None with FDLE unless they were involved with preparing for trial.  I would talk to the Sheriff's officers when preparing for trial and sometimes before the complaint was filed.<br><br>Object to further detail as invading the thought process and violating the Court's Order. |
|---|---|

Here, Mr. Witten states that he sometimes spoke with officers prior to the time the complaint was filed. If oral deposition had been permitted, I would have followed up with a question about whether he had done so in this case. Perhaps Mr. Witten's assertion at this point of "thought process" privilege is meant to forestall such

questions. However the mere fact that Mr. Witten may have discussed this case with the investigators prior to the complaint being filed, or even what they discussed, does not necessarily reveal what decisions he made based on those discussions and does not entitle him to privilege.

Had I been permitted to do an oral deposition, I would have followed up by asking whether all evidence collected and the significance of the evidence was expected to be revealed in the investigators reports or whether they were ever communicated verbally, without any writing, and whether, in the instant case, information about evidence was provided orally as the case was beginning. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 3. Describe how criminal case files were maintained and organized, including any division of the parts of the files through clipping or tabbing or other method of presentation, and including whether any parts of the file were ever separated from each other and, if so, how these separate parts were maintained and organized and identifying the persons with responsibility to maintain and organize all the parts of the file(s) and their dates of service in that capacity. | The investigating officers filed the complaint with the clerk's office and copies were sent to the Office of the State Attorney and the Office of the Public Defender.  The secretaries in our office logged the complaint in and my organization depended on the sophistication of the case. Any reports sent by investigating officers were logged in by either Pam Simmons or Jane Sherrill and put in a file for the attorney.  Ms. Simmons was there when I started working for the office and is still there. I started work at the office in  August of 1987 and Ms. Sherill started work there shortly thereafter and has continued to work there except for the time she was my Judicial Assistant.

Objection to further details as invading the thought process and not in compliance with the court's order. |

Other than saying that the organization of the file depended on "the sophistication of the case" Mr. Witten says nothing about how files were organized in either more or less sophisticated cases. He says nothing about whether the case files were kept unified or whether they were broken up into parts which might have ended up in different places in the custody of other persons. This frustrates any effort to see if a portion of the file that might have contained the missing exculpatory evidence if it had been provided by the officers could have been lost or destroyed.

Had I been permitted to examine Mr. Witten in oral deposition, I would have asked him to describe how, whether in a "sophisticated case" or otherwise, the files were physically arranged and where he would go to look for something like DNA evidence or a medical report. I would have asked further follow-up questions based on the answers I received on the foregoing.

Since I am asking fact questions and not questions that implicate Mr. Witten's mental processes in making prosecutorial decisions, Mr. Witten is not entitled to the assertion of privilege. It is hard to imagine how the physical structure of a file in a criminal case merits an assertion of privilege based on mental processes.

| 4. Describe any procedures employed to ensure Assistant State Attorneys received or were aware of evidence collected or generated by law enforcement, describing any guides, policies, or procedures used, and describing any evidence logs and checklists that were maintained and identifying by whom they were maintained and their dates | There was no formal policy. It was my experience that all reports the investigating officers obtained were provided to the Office of the State Attorney. The investigating officers maintained the evidence for trial. Generally, the Assistant Public Defender sent us a demand for discovery as soon as they got the complaint from the clerk. We would then |

| | |
|---|---|
| of service in that capacity. | provide a form response in compliance with the rules of discovery, providing copies of everything in our file.  When the secretaries copied the file they usually put a check in the corner of the document. |

Here, Mr. Witten describes a process that appears to be virtually automatic. There doesn't seem to be any sort of checklist or form for accounting for evidence. However in his answer to question 3, Mr. Witten says that complaints are "logged in" by the office secretaries. This seems inconsistent.

If I had been permitted to take oral depositions, I would have followed up by asking whether the investigators sent prosecutors just the basic reports or whether they also sent over things like evidence logs or chain of custody documents as well as narrative reports and, if not, how did he know how to check off the categories of evidence in the discovery response. However, if this was done, why are the logs not in the State Attorney's file? I would have asked for a further description of the "logs" used by the secretaries mentioned in the response to question 3. I would have asked further follow-up questions based on the answers I received on the foregoing.

| | |
|---|---|
| 5. Describe procedures employed in your office to ensure that evidence collected or generated by law enforcement for use in criminal prosecutions and transferred to the Office of the State Attorney was not lost, hidden, destroyed or otherwise mishandled, identifying any persons responsible to carry out such procedures and giving their dates of service in that capacity. | There were no formal procedures and I was never aware of any problem.  The investigating officers maintained the evidence. All reports which the officers had were furnished to the Office of the State Attorney and were then furnished to the Office of the Public Defender or private attorney. |

Mr. Witten responds that there were no procedures to check on missing evidence and explains that he was never aware of any problem. And yet, obviously the instant case presents such a problem in which reports in the possession of investigators did not make it into prosecutor's files.

If I had been permitted to take oral depositions, I would have followed up by asking him if, in fact, he had knowledge that the police reports in this case were, in fact, turned over to the Office of the State Attorney, contrary to the testimony of Assistant State Attorney Brian Hill. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 6. Was there a practice at the Office of the State Attorney that was consistent with the disposing of documents collected or received in a criminal case and, if so, please describe the circumstances under which that could occur? | We complied with the statutory provisions for maintenance of public records. |
|---|---|

Since there are many conceivable ways of complying with a statute (e.g., it would not be a violation of the statute to keep records past the destruction date), the terse answer here is evasive and unresponsive.

If I had been permitted to conduct an oral deposition, I would have asked a follow-up question about whether prosecutors, in the course of the litigation, might destroy duplicates of documents or documents that appeared to have no evidentiary value for either side, trying to determine if a mistake might be made. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 7. Describe the procedures in your office for providing and updating discovery production to defendants, including a description of any such procedures that were in writing, and whether there were deadlines or time frames for updating discovery from the time evidence was received to the time it was turned over to counsel for the Defendant? | We complied with the statutory provisions and Rules of Criminal Procedure. |
| --- | --- |

Since there are many conceivable ways of complying with a statute or rule, the terse answer here is evasive, incomplete, and unresponsive.

If I had been permitted to conduct an oral deposition, I would have asked follow-up questions about what specific statutes or rules were followed and asked for a description of how they were followed. I would have asked, again, whether there was an internal time frame within which discovery was updated. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 8. If the evidence in a rape case included a rape examination report by a doctor or a DNA testing report how would those reports typically be provided to you, including a description of the chain of custody of the reports? | See answer to No. 3 above. |
| --- | --- |

Mr. Witten simply refers me back to his response to Question 3, in which he says that the way files are organized depends on the "sophistication" of the case, without saying more about how a more or less sophisticated file is organized.

This question relates directly to one of the types of reports that was missing from the State Attorney's file, according to former Assistant State Attorney Brian Hill. Had I been permitted to conduct an oral deposition, I would have followed up with

questions about whether cases alleging "child rape" are given any sort of special treatment and, if so, what sort of special treatment they would typically get.

| 9. As to the attached exhibits A, B, and C, did you ever receive these documents during the time that you were Assistant State Attorney for the Fourteenth Judicial Circuit and, if so, as to each, explain any handwritten notations on the documents made by you or persons in your office and describe how you handled and maintained them in State v. David Polk. | I don't remember.  None of the notes are in my handwriting. |
| --- | --- |

The documents referred to are (A) the July 29, 1999 DNA report; (B) the August 23, 1999 DNA report, and (C) the hospital rape examination report. Given that these are the exculpatory documents the absence of which led Mr. Witten to push to have an innocent man sent to prison for a long time, it simply isn't credible that he doesn't remember the documents. If Mr. Witten truly didn't recognize the documents, that suggests he never saw them.

Had I been permitted to conduct an oral deposition, I would have followed up with questions about whether there were other such incidents in his prosecutorial career and whether he considered such incidents of any special importance. I would have asked him whether their exceptional importance suggests to him that if he can't remember them now, they must not have been provided to him. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 10. Did you ever speak with the following persons regarding the evidence in the prosecution of David Polk and If so, please give the substance of the conversation: | I don't remember except I know I talked to Tom Godwin and Rita Piercy.  The substance of the conversation would invade the thought process and is not in compliance with the |
| --- | --- |

| | |
|---|---|
| a. Vincent Ivers<br><br>b. Terri Holton<br><br>c. Patricia Kelly<br><br>d. Tom Godwin<br><br>e. Rita Piercy<br><br>f. Any forensic experts<br><br>g. Any victim advocate<br><br>h. Brian Hill<br><br>i. Glenn Hess | court's order to the extent I might remember. |

Mr. Witten refuses to discuss the substance of his conversations with other persons. Several of them, Dr. Ivers who did the rape examination, nurses, Holton and Kelly, Judge Hess, these people would not have been within any circle of confidentiality even at the time of the prosecution. However work product is no longer the issue. The claimed privilege is the deliberative privilege and if Mr. Witten communicated with any of these people on fact issues and not about how he made prosecutorial decisions, then that conversation is discoverable. If the person was not part of the prosecution team, there is no privilege as to anything, just as if he discussed his prosecutorial deliberations on television or wrote a book about the case.

Had I been permitted to conduct oral deposition, I would have asked more specific questions based on the role of each of the persons mentioned and had the witness review related documents. I would have asked further follow-up questions based on the answers I received on the foregoing.

**Answers of Brian Hill**

| Deposition Question | Response |
|---|---|
| 1. Describe any procedures employed to ensure Assistant State Attorneys received or were aware of evidence collected or generated by law enforcement, describing any guides, policies, or procedures used, and describing any evidence logs and checklists that were maintained and identifying by whom they were maintained and their dates of service in that capacity. | In every criminal case, the agency that made the case was responsible for securing the evidence, and maintaining for trial. I received investigative reports and supplemental reports from the agency, which indicated evidence had been collected. In my tenure as a prosecutor, there were several persons within the GCSO that maintained the evidence. I remember Tim Hightower and Jay Smith, but do not recall their dates of service. |

Here, Mr. Hill describes a process that appears to be virtually automatic. There doesn't seem to be any sort of checklist or form for accounting for evidence internal to the State Attorney's Office. However Mr. Witten says that complaints are "logged in" by the office secretaries. This seems inconsistent.

If I had been permitted to take oral depositions, I would have followed up by asking whether the investigators sent prosecutors just the reports and supplements or whether they also sent over things like evidence logs or chain of custody documents as well as narrative reports and, if not, how did he know how to check off the categories of evidence in the discovery response. However, if this was done, why are the logs not in the State Attorney's file? I would have asked for a further description of the "logs" used by the secretaries mentioned by Fred Witten. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 2. Describe procedures employed in your office to ensure that evidence collected or generated by law enforcement for use in criminal prosecutions and transferred to the Office of the State Attorney was not lost, hidden, destroyed or otherwise mishandled, identifying any persons responsible to | I am not aware of any procedures employed by the SAO 14th Circuit to ensure law enforcement did not lose, destroy, hide or mishandle evidence. The evidence law enforcement collected was disclosed to us in reports, and there was a general expectation that law enforcement knew or should |

| carry out such procedures and giving their dates of service in that capacity | have known the evidence would be secure, and a chain of custody kept on the evidence until the case was disposed of.  Thereafter, evidence would be destroyed pursuant to a court order, once it was determined that the evidence no longer had any value to the criminal proceedings. |
|---|---|

Mr. Hill claims that no one inside the State Attorney's Office had a role in making sure that evidence was not lost or mishandled. Apparently the State Attorney's Office had an investigator (Guy White in Mr. Hill's time) and it would be surprising if Mr. White had no such responsibility.

If I had been permitted to conduct oral depositions, I would have asked Mr. Hill about a meeting he had with Jay Smith at the Sheriff's Office on February 22, 2007, together with State Attorney's investigator Guy White, seeking to have additional evidence tested for DNA prior to the resumed prosecution of Mr. Polk in order to see if they could find any new DNA evidence on other items of clothing that might implicate Mr. Polk. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 3. Was there a practice at the Office of the State Attorney that was consistent with the disposing of documents collected or received in a criminal case and, if so, please describe the circumstances under which that could occur? | The office did dispose of documents in felony case files that had been closed for an extended period of time. Generally, felony case files were kept for 10 years beyond the date the file was closed.  Case files for death case, and other high interest cases were not destroyed.  Misdemeanor case files were destroyed sooner. |
|---|---|

The response merely deals with the ultimate disposal of closed files.

If I had been permitted to conduct oral depositions, I would have followed up by asking Mr. Hill if there was any particular practice about disposing of documents

during the time a case was being litigated as, for instance, where a document was

judged not to have any relevance to any claim or defense in the case and if this were

done at any point in the Polk case. I would have asked further follow-up questions

based on the answers I received on the foregoing.

| | |
|---|---|
| 4. What efforts did you make to find the Rape Examination Report and the July 29, 1999 FDLE Criminal Laboratory Report on DNA Evidence prior to telling Judge Pittman at David Polk's hearing to withdraw his plea on April 21, 2006, that those reports were missing from the State Attorney's file in State v. Polk. | I reviewed the case file maintained in the SAO, which appeared to be intact, containing all the information our office had received from law enforcement. |

It appears that Mr. Hill is describing a very minimal effort given the seriousness

of a situation in which a defendant was denied exculpatory evidence in his defense.

If I had been permitted to conduct oral depositions, I would have asked Mr.

Hill whether he picked up the phone and called anyone, whether he spoke to the

investigators on the case, whether he sought an explanation for the fact that reports

that would have been central to the prosecution case were missing. I would have

asked further follow-up questions based on the answers I received on the foregoing.

| | |
|---|---|
| 5. Please describe the circumstances under which you first discovered that medical reports and DNA evidence were missing from the State Attorney's File in the case of State v. David Polk and describe any efforts you made to report the absence of those records, identifying the persons to whom you reported the absence and the substance of those persons' responses. | I do not recall the circumstances of how I first discovered the medical reports and DNA evidence report were not in the SAO file.  My recollection is that I first learned of the reports when Mr. Polk filed his post-conviction motion. |

Mr. Hill answers the first part of the question: how he recalls he first discovered the missing exculpatory evidence. However he ignores the second part of the question, whether and to whom he reported the absence of the evidence.

If I had been permitted to conduct oral depositions, I would have asked Mr. Hill about how the fact of the missing exculpatory evidence was treated internally by the State Attorney's Office and whether any situations like that had arisen before. If so, I would have followed up on what was done to address the problem. I would have asked further follow-up questions based on the answers I received to the foregoing.

| 6. What efforts did you make to ascertain that the Rape Examination Report and the July 29, 1999 FDLE Criminal Laboratory Report on DNA Evidence were missing from the State Attorney's file in January 2000, on the date of David Polk's plea to probation in State v. Polk, before you took over the case | See above #5 |
|---|---|

Mr. Hill answers a very different question giving the same answer as in Question 5. If I had been permitted to conduct oral depositions, I would have asked Mr. Hill whether he ever spoke to Mr. Witten or any of the other persons who would have been involved in the initial prosecution. I would have asked him if he suspected any wrongdoing in the initial prosecution and if not, why not. I would have asked further follow-up questions based on the answers I received on the foregoing.

| 7. As to the attached exhibits A, B, and C, did you ever receive these documents during the time that you were Assistant State Attorney for the Fourteenth Judicial Circuit and if so, as to each, explain any handwritten notations on the documents made by you or persons in your office. | I recall those documents coming in Mr. Polk's post-conviction motion, and reviewing the file. I do not recall them being in the file before that time. There are no notations on those documents made by myself. |
|---|---|

The documents referred to are (A) the July 29, 1999 DNA report; (B) the August 23, 1999 DNA report, and (C) the hospital rape examination report. It appears that Mr. Hill is saying he received the documents from Mr. Polk.

If I had been permitted to conduct oral depositions, I would have asked Mr. Hill whether he followed up with investigators and whether they explained why those documents would have been missing from the file. I would have asked further follow-up questions based on the answers I received on the foregoing.

| | |
|---|---|
| 8. As to the Exhibit D to this deposition, please identify the author of this note, the approximate date you received it, and identify the person referred to as "Janice" where the author writes, "If we show that it didn't mean a different outcome, Janice was not remiss." | Joe Grammer; Janice Scheffer.   Objection to further information which violates the ASA's thought process and the Court's order. |

The one part of the question that was not answered was the date Mr. Hill received this note. Presumably that is the basis for the claim of privilege.

If I had been permitted to conduct oral depositions, I would have asked Mr. Hill if this note was written in reference to the Fla.R.Crim.P. 3.850 motion that had been filed by Mr. Polk as to his conviction for rape. There is no basis for privilege of such information. I would have asked further follow-up questions based on the answers I received on the foregoing.

| | |
|---|---|
| 9. Please identify the following persons and describe their relationship to the investigation and prosecution of David Polk, including all actions taken by them with regard to the investigation and prosecution of the case. | Joe Grammer; my supervisor from 2004-2008<br><br>Jarred Patterson; ASA assigned to Gulf County Court, 2006-2008<br><br>Guy White; Investigator in Gulf County SAO, 2004-2008 |

| | |
|---|---|
| Joseph F. Grammer III<br><br>Jared Patterson<br><br>Guy White<br><br>Jay Smith<br><br>Magda Clanton<br><br>Fred Witten | Jay Smith; Crime scene/Evidence tech, Gulf County Sheriff's Office<br><br>Magda Clanton; Florida Department of Law Enforcement, Crime Lab<br><br>Fred Witten, former ASA for Gulf County, then County Judge<br><br>I do not recall their specific actions as pertaining to the Polk case.  They all were involved in different roles. Objection to further information as invading the ASA's thought process and the Court's Order. |

Given the importance of this case and the fact that an innocent man went to prison for an extended period of time, it is hard to believe that Mr. Hill does not remember the role of these persons and the way in which he interacted with them.

Had I been permitted to conduct an oral deposition, I would have followed up with questions about whether there were other such incidents in his prosecutorial career and whether he considered such incidents of any special importance. I would have asked him whether their exceptional importance suggests to him that if he can't remember them now, they must not have been provided to him. I would have asked further follow-up questions based on the answers I received on the foregoing.

The assertion of privilege is not valid as to a question that solely relates to the actions of persons involved in the case and not Mr. Hill's thought processes.

| | |
|---|---|
| 10. Did you ever speak with the following persons regarding the evidence in the prosecution of David Polk and If so, please give the substance of the conversation:<br><br>Vincent Ivers<br><br>Terri Holton<br><br>Patricia Kelly | I spoke to a number of persons in preparing the case for trial, including the investigating officers, and the analyst at the Florida Department of Law Enforcement.  The substance of our conversations would have been consistent with trial preparation. I am not sure exactly which witnesses I spoke to before the trial.  Objection to any further information as invading the ASA's thought process |

| | |
|---|---|
| Tom Godwin<br>Rita Piercy<br>Any forensic experts<br>Any victim advocate<br>Fred Witten<br>Glenn Hess | and the Court's order. |

Mr. Hill refuses to discuss the substance of conversations he had with other persons. Several of the persons, Dr. Ivers who did the rape examination, the nurses, Holton and Kelly, Judge Hess, would not have shared confidentiality even at the time of the case. However work product is no longer the issue. This claimed privilege is the deliberative privilege and if Mr. Witten was communicating with any of these people on fact issues and not talking about how he was arriving at prosecutorial decisions, then that conversation is discoverable. If the person was not part of the prosecution team, then there is no privilege as to anything, just as if he discussed his prosecutorial deliberations on television or wrote a book about the case.

Had I been permitted to conduct an oral deposition, I would have asked more specific questions as to each of the persons listed and reviewed documents with Mr. Hill. I would have asked further follow-up questions based on the answers I received on the foregoing.

## MEMORANDUM OF LAW

### A. Standard of Review

In his article, *Paying for Silence: The Liability of Police Officers under Section 1983 for Suppressing Exculpatory Evidence*, 13 Temple Political & Civil Rights Law Rev. 1, Prof. Michael Avery writes:

> In the last several years it has been well documented that a large number of innocent persons have been convicted of serious crimes, an alarming number of whom were sentenced to death. There are, of course, many reasons why innocent people may be prosecuted and convicted of crimes they did not commit. The most disturbing cases, in terms of the integrity of the criminal justice system, are those in which police have caused the prosecution of an innocent person by manufacturing or fabricating evidence of guilt, and/or by suppressing evidence of the innocence of the defendant.

As an example, Avery cites the case of George Jones, a high school senior who was convicted of murdering a 12-year-old girl and severely beating her 10-year-old brother. Police took a picture of Jones to the 10-year-old in the hospital. On the initial showing he failed to identify Jones. Police then placed the unhelpful evidence in the "street files." They never made it to the prosecutor. Semen and blood-type mismatches were also excluded from reports. It was only the courageous action of one police investigator that brought the exculpatory evidence to light, that derailed the wrongful prosecution and set Jones free. See Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988). Avery at 2-4.

Prosecutors have not always been innocent dupes of police deception. Often they have been willfully blind and, at worst, they have been conspirators, although their immunity has thus far protected them from civil and criminal penalties for their wrongful acts. Here, the prosecutors have responded to Plaintiff's deposition on

written questions with terse, vague, incomplete, unresponsive, and mostly unhelpful answers, as well as illegitimate objections as to their "mental processes." They go as far as they can to obscure the responsibility of law enforcement without accepting any responsibility themselves.

### B. Former Prosecutors' Answers Are Evasive, Incomplete, and Unresponsive

The answers provided by the former prosecutors Witten and Hill, are terse, evasive, incomplete, and unresponsive. They are almost entirely devoid of description. In some places they entirely ignore a part of the question. Where privilege is claimed, the privilege seems designed to avoid discussing actions taken or facts known to them and not to protect their mental processes in reaching prosecutorial decisions. To qualify for privilege, the information sought to be withheld "must be 'deliberative,' playing 'a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters.' *Nadler v. United States Dep't of Justice*, 955 F.2d 1479, 1491 (11th Cir.1992). (*quoting Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C.Cir.1975)). '[P]urely factual material that does not reflect the agency's deliberative process general is not protected.'" *In re Polypropylene Carpet Antitrust Litig.*, 181 F.R.D. 680, 695 (N.D. Ga. 1998).

Where a witness's answers to deposition on written questions are "evasive, incomplete, unresponsive," a party may apply to have the witness cross-examined orally. *U.S. v. National City Bank of New York*, 1 F.R.D. 367, 368 (S.D.N.Y. 1940). Here

the witnesses have been just that: evasive, incomplete, and unresponsive. Where the nature of the information to be acquired suggests the necessity for confronting and questioning the deponent, oral examination may be appropriate. *Groll v. Stolkin*, 12 F.R.D. 262 (S.D.N.Y. 1951). This is a case where a fair opportunity to get to the heart of the Plaintiff's claims will take nothing less than a deposition on oral examination, the deposition on written questions having failed. Further, there is a need to have the answers under oath. The answers provided in writing were unsworn.

### C.  Former Prosecutors Are Not Entitled to Avoid Oral Deposition

Witnesses Fred Witten and Brian Hill, former prosecutors involved in the case, State v. David Polk, have sought to avoid deposition under Fed.R.Civ.P. 30. They have cited *Imbler v. Pachtman*, 424 U.S. 409 (1976) and *Pierson v. Ray*, 386 U.S. 547 (1967) to say that prosecutors, like judges, have "absolute immunity" and imply that such immunity insulates them from the discovery process even when they are not parties. Plaintiff has agreed they have immunity for prosecutorial decisions, even when those decisions constituted constitutional violations. However that does not translate to "absolute immunity" from deposition as a witness.

The witnesses cite *United States v. Morgan*, 313 U.S. 409 (1941), in which the U.S. Secretary of Agriculture was deposed at length on how he reached certain conclusions set forth in an order, as analogous to this situation. The U.S. Supreme Court found that the decision process was "not unlike the judicial process in similar situations" and should not have been subject to deposition.  Here, the parties are seeking the answers

to questions about the provenance or disposition of certain evidence that might have impacted the criminal case of the Plaintiff.

The witnesses also cite *Standard Packaging Corp. v. Curwood, Inc.*, 365 F.Supp. 134, 135 (N.D. Ill. 1973) for the proposition that the deposition of a former patent examiner "may still be objectionable if it invades upon an official's good-faith decision-making prerogatives." They cite another patent case that held that a patent examiner enjoys quasi-judicial privilege. *Western Elec. Co., Inc. v. Piezo Tech., Inc.,* 860 F.2d 428 (Fed. Cir. 1988). There, the court held that it was permissible under *Morgan* and its progeny to determine from an examiner "whether a party had submitted certain information" but could not probe the examiner's "knowledge and thought processes." *Id.* at 433. It is the former issue, "whether a party had submitted certain information," that the deposition of the former prosecutors is aimed at securing. There is no issue about the former prosecutors thought processes and no such questions were contemplated by Plaintiff.

Plaintiff has deposed the Sheriff's investigators who secured the evidence that was ultimately found to be missing from the files of the former prosecutors. Plaintiff has attempted in good faith to secure information relating to the disposition of the missing evidence by submitting to the former prosecutors written questions under Fed.R.Civ.P. 31. This effort has failed. The former prosecutors have responded with answers that were evasive, incomplete, unresponsive, and sought to rely inappropriately on privileges that did not apply to the kind of information sought.

Plaintiff has an urgent need to confront the former prosecutors regarding the issue of the missing evidence. It is the heart of the Plaintiff's case and without a fair exposition of critical evidence, there is no hope that this matter will be tried and decided on the merits. Given that the former prosecutors appear to be hostile witnesses as to the provenance or disposition of material evidence that might have substantially affected a criminal case, it does not appear a deposition on written questions can be sufficient to satisfactorily reach the information needed.

### D. Answers Should Be Followed-up with Further Discovery

There is a need for Plaintiff to conduct further depositions based on the names of persons mentioned in the answers to the written questions and such other names that might be secured through oral depositions of the former prosecutors. It is anticipated that these persons would not be numerous and it should be possible to complete the depositions in two partial days. This could easily be done in the more than one month remaining before pretrial in this case.

### E. Motion to Compel Should Be Taken Out of Time

Plaintiff received the answers to the written questions after the time for discovery had already ended. Thus, Plaintiff seeks the permission of the Court that the Motion to Compel be heard now.

WHEREFORE, based on the foregoing arguments and citations to authority, Plaintiff moves this Honorable Court to Compel from the witnesses better answers to the written questions, or alternatively to submit to oral deposition, and in any case to

permit further discovery based on their answers, or, if all the requested relief is to be denied, to deem this Motion incorporated into Plaintiff's Response to Defendants' Motions for Summary Judgment and to find that the Answers, such as they are, create a jury question such that Summary Judgment should be denied to the Defendants.

Respectfully Submitted,

*s/ James V. Cook*
JAMES V. COOK
Florida Bar Number 0966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
(850) 222-8080; 561-0836 fax
cookjv@nettally.com

I CERTIFY that I have conferred with counsel for Defendants, pursuant to Local Rule 7.1, and counsel for Defendants does oppose the relief sought.

I CERTIFY the foregoing was filed electronically on 05/13/2013 and that the person noted below is registered to be notified by the CM/ECF electronic mail system:

| | |
|---|---|
| John W. Jolly, Jr. | Cecilia Bradley |
| Jolly & Peterson, P.A. | Office of the Attorney General |
| P.O. Box 37400 | PL 01 The Capitol |
| Tallahassee, FL 32315 | Tallahassee, FL 32399-1050 |

*s/ James V. Cook*
JAMES V. COOK
